UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

ELIZABETH WONG,                     )
                                    )
            Plaintiff,              )
                                    )    11 C 7357
      v.                            )
                                    )    Judge George M. Marovich
BOARD OF EDUCATION OF               )
COMMUNITY CONSOLIDATED SCHOOL        )
DISTRICT 15, SCOTT THOMPSON,        )
MARY SZUCH, JOHN FENTON,            )
and JAMES GARWOOD,                  )
                                    )
            Defendants.             )

## MEMORANDUM OPINION AND ORDER

After she was suspended from her job and her annual contract not renewed, plaintiff

Elizabeth Wong filed suit against defendants Board of Education of Community Consolidated

School District 15 (the "Board"), Scott Thompson ("Thompson"), Mary Szuch ("Szuch"), John

Fenton ("Fenton") and James Garwood ("Garwood"). In Count I, plaintiff alleges defendants

retaliated against her for exercising her free speech rights guaranteed by the First Amendment of

the United States Constitution. In Count II, she alleges retaliatory discharge under Illinois law.

In Count III, plaintiff alleges retaliation in violation of the Illinois Whistleblower Act. In Count

IV, plaintiff alleges that defendants intentionally interfered with her employment relations. In

Count V, plaintiff alleges the Board violated Title VII. In Count VI, plaintiff alleges that the

Board violated the Americans with Disabilities Act by discriminating against her due to her

association with a disabled person. Finally, in Count VII, plaintiff seeks relief under § 1983 for

interfering with her liberty without due process.

Defendants have filed a motion for summary judgment. For the reasons set forth below, the Court grants in part and denies in part the motion for summary judgment.

## I.  Background

The following facts are undisputed unless otherwise noted.[1]

Defendant Board governs a school district ("District 15") serving students in kindergarten through the eighth grade. Defendant Scott Thompson has been Superintendent of District 15 since July 2010. Defendant James Garwood is the Assistant Superintendent for Administrative Affairs. Mary Zarr ("Zarr") is the Assistant Superintendent for Curriculum, Special Services and School Improvement. Defendant James Fenton is the Board's Director of Personnel.

The Board operates many elementary and middle schools. It staffs each school with a principal, assistant principal and teachers. The principals and assistant principals are hired on one-year contracts.

The Board hired plaintiff Elizabeth Wong ("Wong"), who had nearly twenty years of teaching experience, as an Assistant Principal. Specifically, for the period July 1, 2008 through

---

[1]Local Rule 56.1 outlines the requirements for the introduction of facts parties would like considered in connection with a motion for summary judgment. The Court enforces Local Rule 56.1 strictly. Facts that are argued but do not conform with the rule are not considered by the Court. For example, facts included in a party's brief but not in its statement of facts are not considered by the Court because to do so would rob the other party of the opportunity to show that such facts are disputed. Where one party supports a fact with admissible evidence and the other party fails to controvert the fact *with citation to admissible evidence*, the Court deems the fact admitted. *See Ammons v. Aramark Uniform Services, Inc.*, 368 F.3d 809, 817-818 (7th Cir. 2004). This does not, however, absolve the party putting forth the fact of its duty to support the fact with admissible evidence. *See Keeton v. Morningstar, Inc.*, 667 F.3d 877, 880 (7th Cir. 2012). Asserted "facts" not supported by deposition testimony, documents, affidavits or other evidence admissible for summary judgment purposes are not considered by the Court.

June 30, 2009, the Board employed Wong on a one-year contract as an Assistant Principal at Carl Sandburg Junior High School ("Sandburg"). Likewise, from July 1, 2009 through June 30, 2010, the Board employed Wong on a one-year contract as Assistant Principal at Sandburg. During the time she worked for District 15, Wong did not have tenure. Without tenure, Wong's continued employment was contingent upon the Board's renewing her employment contract.

At Sandburg, Wong reported to Principal Edward Nelson ("Nelson"). Nelson lacked the power to hire, fire or reassign Wong and also lacked the power to change her benefits. During Wong's first year at Sandburg (the 2008-2009 school year), nothing relevant to this suit seems to have occurred. The events related to this lawsuit began by the middle of the next school year (the 2009-2010 school year).

In November 2009, Wong contacted Assistant Superintendent Zarr to discuss Principal Nelson. Wong reported to Zarr that Nelson had been calling her on her cell phone at night and that he sounded intoxicated. (In all, Nelson placed between 18 and 21 phone calls to Wong's cell phone between January 2009 and April 13, 2010.[2]) Plaintiff has put forth admissible evidence (and defendant has disputed with admissible evidence) that during her conversation with Zarr, Zarr told plaintiff that the calls were "sexual harassment," a characterization with which plaintiff agreed. It is undisputed that Wong told Zarr that she wanted to handle the situation with Nelson and that she just wanted Zarr to know what she was dealing with. At about the same time, Wong sent to a friend an email in which she wrote, "I stated [to Zarr] that I'm

---

[2]Nelson never propositioned Wong, never asked for sexual favors and never asked her out on a date.

pushing back on Ed right now, and that I don't know how things will play out down the line. So I needed someone to know what was behind all of this."

Wong also discussed Principal Nelson with the District's Director of Personnel, Fenton. In January 2010, Wong told Fenton her concerns about Principal Nelson's drinking and his phone calls to her. That month, Wong met in person with Fenton and Assistant Superintendent Zarr to discuss Nelson.

Wong also discussed Nelson's drinking with Nelson. On February 8, 2010, Wong met with Principal Nelson. Wong told Nelson she smelled alcohol on his breath and urged him to get medical attention for his drinking problem. Wong told Nelson she was meeting with the cabinet (by which she apparently meant the Superintendent and his assistants). Also in early 2010, Wong told Nelson that his calls to her cell phone were unwelcome.

In the meantime, District 15 was considering staffing for the next school year. To that end, then-Superintendent Dan Lukich, Assistant Superintendents Zarr and Garwood and Director of Personnel Fenton met with all of the district's assistant principals to discuss their career goals. Wong's meeting to discuss her career goals with Lukich, Zarr, Garwood and Fenton was held on February 13, 2010. This meeting was essentially an interview, and Wong told the group that she was interested in becoming a principal at an elementary school. At the end of the meeting, Lukich mentioned Principal Nelson's drinking.

Days later, on February 17, 2010, Wong sent her mentor an email, in which she wrote, "I don't feel it affects me much" in reference to Principal Nelson. The next day, Wong wrote her mentor that she had "a very good relationship" with Nelson. Wong wrote, "I'm not worried about this school. The school is functioning very well with the efforts from both of us. I am

very, very, very concerned about this individual person's well-being . . . Not harmful to our students, but harmful to himself." On February 28, 2010, Wong sent another friend an email, in which she wondered, "What is my Christian, moral responsibility in all of this????? I know you might think this is surprising, but despite all of the drama, Ed and I work very well together and have become professional friends . . . I do not believe that the school or the kids are in harms [sic] way at all." On March 3, 2010, Wong sent an email to Assistant Superintendent Zarr. Wong had attached to her email to Zarr a draft letter to Principal Nelson. In the draft letter to Nelson, Wong described herself and Nelson as "quite a team" and stated that they had "developed a friendship."

In March 2010, Assistant Principal Garwood and then-Superintendent Lukich met with Wong. The purpose of the meeting was to tell Wong that she would be transferred to Whiteley Elementary School for the following school year (on a one-year contract beginning July 1, 2010 and ending June 30, 2011). Wong was one of seven assistant principals transferred within the district at the end of the 2009-2010 school year. The reasons for Wong's transfer were to bolster her credentials to support her long-term goal of becoming a principal, to give her experience at an elementary school, to alleviate her concerns about Nelson and, partly, to separate her from Nelson. The day after Wong was notified about the transfer, she told Fenton she would prefer to stay at Sandburg with Nelson.

In late April and early May 2010, Wong contacted Fenton three times to report that she thought Nelson was under the influence of alcohol during the school day. On two of those occasions (and other times without prompting from Wong), Fenton and Garwood went to Sandburg to determine whether Nelson was under the influence of alcohol. Fenton and Garwood

found no evidence of Nelson's being under the influence of alcohol.  At some point, Wong reported to Fenton that Sandburg staff members had told Wong that Nelson smelled of alcohol during the work day, but Fenton did not ask other employees whether they had observed Nelson under the influence of alcohol during the work day.  Plaintiff put forth admissible evidence (which defendant has disputed with admissible evidence) that, during the same time period, Fenton told Wong that it was not District 15's best-kept secret that Nelson had a drinking problem and was a skirt chaser.

In May 2010, Principal Nelson met with District 15 administrators (it is not clear from the record which ones).  Nelson was told that he had been accused of having been under the influence of alcohol during the work day and that violations of the district's alcohol-free workplace policy would result in discipline.  The district put a letter to that effect in Nelson's file.

At some point thereafter (when is not clear in the record), Wong asked Fenton if she could be transferred to Whiteley early (before the end of the school year).  The request was granted, but it is not clear from the record whether Wong actually left Sandburg early.

On June 2, 2010, Wong sent Farr an email, in which she stated, "As my last day at Carl Sandburg grows nearer, staff at SC are confiding more and more things to me.  Evidently, there has been quite a history of sexual harassment over the past 6 years.  Nothing recent, but over the past 6 years.  Things you should be aware of."  Zarr telephoned Wong and told her she needed to report it.  Wong backed off.  On June 10, 2010, Wong sent Zarr an email in which Wong wrote, "Just a few minutes ago [Nelson] told me that today is National St. Nipples Day.  Okay, then.  Oh my . . . not cool . . . Don't think he meant anything by it.  Just not filtering too well lately."

The same day, Wong sent to a friend an email in which she stated, "Thank God for Mary Zarr. She coached and encouraged me through it all." By June 28, 2010, Wong sent her friend an email, in which Wong stated, "But I am more trusting of our current administration than any other that I have ever worked for. They have shown care for all individuals in this situation, more than you would likely see in most districts."

On June 16, 2010, Wong saw for the first time her contract for the 2010-2011 school year. When she read her contract, Wong learned that assistant principals at elementary schools do not receive the $2,000.00 per year stipend that assistant principals at middle schools receive for their additional duties. Wong's position as Assistant Principal of Whiteley carried the same prestige, responsibility, benefits and base salary as her prior position. Still, factoring in the loss of the stipend and her merit-based salary increase, Wong's compensation for the 2010-2011 school year was $178.00 less than her compensation for the 2009-2010 school year.

The new contract year began on June 30, 2010. Wong, in her new position at Whiteley Elementary, reported to defendant Mary Szuch, the Principal. Another change for the 2010-2011 contract year was that Superintendent Lukich left the district. He was replaced by defendant Scott Thompson, the new Superintendent.

After Wong's transfer to Whiteley, Wong interacted with Nelson one last time. Nelson and Wong spoke at a new teacher luncheon on August 11, 2010. Although the parties have not put into the record any details about the interaction, it is undisputed that Wong complained to Fenton the same day. The next day, Fenton met with Nelson. By August 20, 2010, Fenton sent Nelson a letter in which he instructed Nelson not to have further contact with Wong and not to retaliate against her. Nelson had no contact with Wong after August 11, 2010.

In the meantime, Wong had been working at Whiteley for a few months.  Principal Szuch was impressed with some aspects (the parties do not say which aspects) of Wong's performance and complimented Wong on those.  Other aspects of Wong's performance, however, concerned Szuch.  By September 17, 2010, Szuch was concerned by Wong's behavior and began taking notes about Szuch.  Szuch kept the notes to herself and did not put them in Wong's personnel file at Whiteley.  Although Szuch sincerely believed the concerns she had with Wong's performance, Szuch never put Wong on a performance improvement plan.  The school year continued.

In early November 2010, Wong met with Thompson, the new Superintendent.  The purpose of the meeting was to discuss Wong's goal of becoming a principal.  Although the record does not contain evidence of what Wong and Thompson discussed, it is undisputed that Wong left the meeting with the impression that Thompson thought Wong "did not act to address the behaviors that were compromising the well-being of students at Sandburg," as Wong described it at her deposition.  On November 5, 2010, Wong sent Thompson an email, attached to which was a four-page, single-spaced document Wong had prepared outlining the time line of events at Sandburg.

In early February 2011, Wong and Szuch had a disagreement (the details of which are not in the parties' statements of fact) over the handling of an early dismissal of students due to snow.  On February 6, 2011, Wong sent to Fenton an email in which Wong requested a meeting with a mediator to discuss the incident.  On February 8, 2011, Assistant Superintendent Garwood called Wong into a meeting with Principal Szuch.  Szuch handed Wong a document she had created.  It read:

February 4, 2011

To:              Liz Wong, Frank C. Whiteley Assistant Principal
From:          Mary Szuch, Frank C. Whiteley Principal
Memo:        Administration Expectations and Areas of Improvement

1)      Support the principal as leader in the building with all programs and issues.
        A.     Part-time nurse situation
        B.     Assist with outside supervision on consistent basis.

2)      Distance yourself from prior friendships at Sandburg Jr. High–maintain a professional level.
        A.     Deb Hughes, Secretary
        B.     Karen Hanisch, CS Special Education Teacher/FCW parent with special needs children

3)      Supervisory Role
        A.     Assistant Principal is the trainer on the new gradebook, report cards, student homework etc.
        B.     Scale back time spent with Pam Tackett as your personal assistant–that is not her role.
        C.     Balance your time with the office clerical and secretary.

4)      Professionalism
        A.     Wear appropriate attire–appropriate neckline on blouse/top.

Wong was "blindsided" by the last point. Wong "felt that was just blaming the victim in the situation that occurred at Sandburg."

A few days later, on February 11, 2011, Szuch added an entry to the notes she had been keeping about Wong. Szuch wrote:

> Liz arrived at 10:00 AM and told me that she was getting a divorce and that was the reason for her behavior this year and her hypersensitivity to criticism. Things have been very difficult and she and the kids are living in Naperville. I asked if it was with her sister or mom and she said yes. She did not feel like she could stay at school and wanted to leave. She emailed me at 10:10 asking me to cover a parent meeting. I just needed to share info on her observation of [student]. 11:00 Liz left–I shared as she was leaving that a friend of mine had a sad situation with her boyfriend suffering from depression/he died. I also said I thought of other situations w/ staff and divorces and did she need another help at school. I have notified police before–she just looked at me and said I talked to Jim or Mary? I said know [sic] and she described the situation as ugly . . .

About a month later, the results of the annual Conditions of Teaching survey were given to the principals within District 15.  The Conditions of Teaching survey is an anonymous survey administered annually to teachers at each school within the district.  The Conditions of Teaching survey is mandated by the contract between the teachers' union and the district and covers such topics as the teaching conditions at the school and the principal's performance.  The District 15 central office distributes the results of the Conditions of Teaching survey to each principal and the teachers' union president, and each principal is tasked with formulating a plan to share the results with his or her staff members.

At Whiteley, Principal Szuch received the results of the 2010-2011 Conditions of Teaching Survey for Whiteley and sent them to Wong on March 7, 2011.  Within a day or two, Wong, without Szuch's permission and before Szuch had shared the results with the staff, forwarded the results of the Conditions of Teaching Survey for Whiteley to the president of the teachers' union, a teacher at Sandburg, a teacher at Whiteley, and the president of the support staff union.

Principal Szuch was upset, as was Superintendent Thompson.  On March 11, 2011, Superintendent Thompson decided to suspend Wong with pay for the remainder of the contract year and to recommend to the Board that they not renew Wong's contract for the 2011-2012 school year.  Thompson made the decision, because of Wong's unauthorized disclosure of the Conditions of Teaching Survey results.

Thompson made the decision despite the fact that no written policy prohibited the dissemination of the Conditions of Teaching Survey results.  During the two years Wong had worked at Sandburg, she had not released the results of the Conditions of Teaching Survey

without her principal's permission.  Instead, Wong, with Principal Nelson's permission, had discussed the results with small groups of teachers.  In March 2011, Principal Nelson emailed the results of the Conditions of Teaching survey for Sandburg to the entire teaching and janitorial staff at Sandburg, for which Nelson (a tenured employee scheduled to retire by June 30, 2011) received a slap on the wrist from District 15.

On March 18, 2011, Fenton and Assistant Superintendent Garwood met with Wong. They informed Wong that she was being suspended with pay for the remainder of the contract year and that they would recommend to the Board that they not renew her contract.  Wong was told the reasons for the suspension and non-renewal of her contract and was given a chance to rebut the bases of the District's actions.  Wong chose not to speak at the meeting.  Also at the March 18, 2011 meeting, Fenton and Garwood gave Wong a copy of her performance evaluation.  Originally, the performance evaluation had been drafted by Szuch.  Garwood and Fenton revised it at least ten times, making increasingly negative comments about Wong.

On April 22, 2011, the Board voted not to renew Wong's contract.  Although Board policies allowed district employees to speak at Board meetings, Wong did not attend.  The Board did not allow Wong's attorney to speak on her behalf.  At the meeting, the Board did not discuss plaintiff's husband.

About six months later, seemingly curious about what the defendants might say about Wong, plaintiff's counsel hired a private investigator to check Wong's references.  The private investigator reached Szuch and Garwood separately.  Szuch told the investigator she had to go to a meeting.  Neither Szuch nor Garwood said anything negative about Wong. When the private

investigator telephoned Szuch and Garwood, he did not have a position to fill, and Szuch's and Garwood's comments to him did not influence his decision not to hire plaintiff.

Assistant Superintendent Zarr provided Wong a letter of reference. In addition, Zarr filled out a reference questionaire for District 34. The questionnaire asked Zarr to rate Wong from 1 (low) to 5 in 14 categories. Zarr rated Wong a "5" in seven categories, a "4" in five categories and a "3" in two categories. The form asked Zarr whether she would recommend that her district rehire Wong. Zarr answered, "no." With respect to a survey about Wong from Oak Park Elementary School District No. 97, Zarr provided positive responses and gave Wong high ratings.

## II.   Summary Judgment Standard

Summary judgment shall be granted when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When making such a determination, the Court must construe the evidence and make all reasonable inferences in favor of the non-moving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). Summary judgment is appropriate, however, when the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "A genuine issue of material fact arises only if sufficient evidence favoring the nonmoving party exists to permit a jury to return a verdict for that party." *Brummett v. Sinclair Broadcast Group, Inc.*, 414 F.3d 686, 692 (7th Cir. 2005).

## III. Discussion

### A. Wong's First Amendment retaliation claim

In Count I, Wong seeks relief under § 1983 and alleges that she was suspended with pay and her contract not renewed in retaliation for her exercise of rights under the First Amendment.[3] Defendants move for summary judgment on that claim.

To show First Amendment employment retaliation, a plaintiff must show: (1) her speech was constitutionally protected; (2) she suffered an employment action sufficiently adverse to deter the exercise of free speech; and (3) her speech was a motivating factor for the adverse action. *Graber v. Clarke*, 763 F.3d 888, 894 (7th Cir. 2014). The "'motivating factor' requirement splits the burden of production between the parties on summary judgment." *Peele v. Burch*, 722 F.3d 956, 960 (7th Cir. 2013). "The plaintiff has the initial burden to produce evidence that [her] speech was at least a 'motivating factor' in the employer's decision to take adverse action against him" and the "defendant may then rebut that evidence by demonstrating that 'the harm would have occurred anyway,' even without the protected conduct." *Peele*, 722 F.3d at 960 (citing *Greene v. Doruff*, 660 F.3d 975, 980 (7th Cir. 2011)).[4]

---

[3]Nowhere does plaintiff argue that her transfer to Whiteley was in retaliation for her exercise of First Amendment rights. The Court assumes the reason plaintiff did not make that claim is that it would have been time barred.

[4]Defendants argue that plaintiff must show but-for causation. While the Seventh Circuit has so held (*see Fairley v. Andrews*, 578 F.3d 518, 525-526 (7th Cir. 2009) ("Some decisions say that a plaintiff just needs to show that his speech was a motivating factor in defendant's decision. These decisions do not survive *Gross*, which holds that, unless a statute (such as the Civil Rights Act of 1991) provides otherwise, demonstrating but-for causation is part of the plaintiff's burden in all suits under federal law.")), it has since clarified that plaintiff must show her speech was a motivating factor. *Greene*, 660 F.3d at 977 (explaining that *Gross* did not overrule the standard

Defendants first argue that Wong did not engage in constitutionally-protected speech. The Court disagrees. Speech is constitutionally protected if it is a matter of public concern, rather than a personal grievance. *Meade v. Moraine Valley Comm. College*, 770 F.3d 680, 684 (7th Cir. 2014). When considering whether speech is a matter of public concern, courts consider the content, form and context of the speech, with the content being the most important factor. *Meade*, 770 F.3d at 684. The speaker's motive is not dispositive. *Meade*, 770 F.3d at 685. In this case, it is undisputed that in late April and early May of 2010, Wong reported to Fenton that Principal Nelson was under the influence of alcohol at work. This Court has no trouble concluding that a school principal drinking alcohol at work is a matter of public concern, and a reasonable jury could so conclude, as well. *Cf. Jandro v. Foster*, 53 F. Supp.2d 1088, 1096 (D. Col. 1999) ("[T]he court finds that plaintiff's private communications to defendant expressing plaintiff's concerns about defendant's alleged drinking on the job also touch upon a matter of public concern. The ability of the district attorney to discharge his investigative and prosecutorial duties in a competent manner, without being impaired by alcohol, is a matter of concern to the community."). It makes no difference that Wong thought the students were not in danger.

Defendants do not dispute that Wong suffered actions (being suspended with pay and having her contract not be renewed) that were sufficiently adverse to deter the exercise of First Amendment rights. Instead, defendants argue that Wong has not put forth evidence that her

---

for First Amendment retaliation claims as outlined in *Mt. Healthy City School Dist. v. Doyle*, 429 U.S. 274, 287 (1977)).

protected speech was a motivating factor. Defendants further argue that even if Wong's speech were a motivating factor, it would have taken the same action anyway.

The Court agrees that Wong has not put forth sufficient evidence from which a reasonable jury could conclude that her speech was a motivating factor for her suspension or for the failure to renew her contract. First, the evidence does not reflect a temporal connection between the events. It was late April and early May of 2010 when Wong told Fenton that Nelson was drinking during the work day. Ten months passed until Wong was suspended. Even assuming Thompson first learned of Wong's speech in November 2010, when she wrote him an email outlining her actions at Sandburg, four months still passed before her suspension. The passing of four months is not evidence of a causal connection. Nor is there any other evidence suggesting that plaintiff's speech was a motivating factor. Wong points to evidence that Szuch kept notes on Wong and that Fenton and Garwood revised Wong's performance evaluation. That evidence, though, sheds no light whatever on whether defendants were motivated by Wong's protected speech.

The question for this Court is not whether it agrees that an assistant principal should be suspended for releasing survey results without her principal's permission. Perhaps that is too harsh a punishment, but a federal court is not the super-personnel department for every employer in the district. The only question for this Court is whether a reasonable jury could conclude, from plaintiff's evidence, that her speech was a motivating factor in the decision to suspend her and not to renew her contract. The answer to that question is no.

Defendants are entitled to judgment as a matter of law on Count I, and their motion for summary judgment is granted as to Count I.

### B.     Wong's retaliatory discharge claim

In Count II, Wong asserts a claim for retaliatory discharge under Illinois common law. Defendants move for summary judgment on the claim, arguing, among other things, that the failure to renew a contract is not a discharge for purposes of Illinois retaliatory discharge law. Plaintiff concedes that she cannot support this claim, as a matter of law.

Accordingly, defendants' motion for summary judgment is granted as to Count II.

### C.     Wong's Title VII claim

In Count V, Wong alleges that the defendant Board violated Title VII of the Civil Rights Act of 1964 by discriminating against her on the basis of her sex, by subjecting her to sexual harassment and by retaliating against her. Defendant moves for summary judgment with respect to each of the alleged violations of Title VII. Plaintiff responded only with respect to her disparate treatment claim, so her claims for sexual harassment and retaliation are deemed abandoned.

Title VII of the Civil Rights Act of 1964 makes it "an unlawful employment practice for an employer–(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a). The Court finds no direct or circumstantial evidence in the record that plaintiff's suspension or termination were due to her sex, so Wong must proceed using the indirect method of proof. To make out a *prima facie* case of sex discrimination, a plaintiff must put forth evidence that: (1) she is a member of a protected class; (2) she was meeting the employer's legitimate expectations; (3) she suffered an adverse employment action;

and (4) a similarly-situated employee not in her protected class was treated more favorably. *Alexander v. Casino Queen, Inc.*, 739 F.3d 972, 979 (7th Cir. 2014). The "burden of establishing a prima facie case of disparate treatment is not onerous." *Texas Dep't of Comm. Affairs v. Burdine*, 450 U.S. 248, 253 (1981). It requires a plaintiff to show that he was "rejected under circumstances which give rise to an inference of unlawful discrimination," and the "standard is not inflexible" because facts vary in different cases. *Burdine*, 450 U.S. at 253 and n.6. If plaintiff makes out a *prima facie* case of discrimination, defendant has the light burden of *articulating* a legitimate, non-discriminatory reason for the adverse action. *Alexander*, 739 F.3d at 979. If defendant does so, plaintiff has the burden to show that the proffered reason was just a pretext for discrimination. *Id.* A pretext is a dishonest explanation, rather than an error. *See Bodenstab v. County of Cook*, 569 F.3d 651, 657 (7th Cir. 2009).

As defendant argues, plaintiff's disparate treatment claim fails for lack of evidence of a similarly-situated individual who was treated more favorably. Plaintiff argues that Fenton, a male, was put on a performance improvement plan and that an unnamed male principal was given the option to resign rather than be fired. The first problem with these two as comparators is that plaintiff did not include in her statement of facts any evidence about their infractions or their discipline. The Court does not consider facts mentioned in briefs but not included in a statement of fact. In any case, plaintiff does not argue (let alone put forth evidence) that these individuals engaged in conduct similar to plaintiff's, so they are not similarly-situated.

Plaintiff comes closer with her argument that Nelson, the Principal at Sandburg, was similarly-situated but treated more favorably. Like Wong, Nelson released his school's results of the Conditions of Teaching survey. Unlike Wong, who was suspended and her contract not

renewed, Nelson received a "slap on the wrist." What makes Nelson different, however, is that Nelson was the Principal of his school and, therefore, had the authority to disseminate the results to his staff. Wong, as an Assistant Principal, needed her Principal's permission to disseminate the results. She did not have it. Title (and, thus, authority) was not the only difference between Nelson and Wong. Nelson had tenure; Wong did not. In short, plaintiff has not created an inference of sex discrimination, because she has not put forth evidence of a similarly-situated individual who was treated more favorably. Defendant is entitled to judgment as a matter of law on Count V. *Kriescher v. Fox Hills Golf Resort & Conf. Ctr.*, 384 F.3d 912, 915 (7th Cir. 2004) (evidence of a similarly-situated individual is an essential element of the *prima facie* case, and, without it, defendant is entitled to judgment as a matter of law on a plaintiff's discrimination claim).

Defendant's motion for summary judgment is granted as to Count V.

**D.    Wong's ADA claim**

In Count VI, Wong alleges that the defendant Board violated the Americans with Disabilities Act by failing to renew her contract, because of "the known disability of her husband." Defendant moves for summary judgment on this claim.

The Americans with Disabilities Act makes it unlawful to "discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). Included in the definition of discrimination under the ADA is "excluding or otherwise denying equal jobs or benefits to a qualified individual because of the known disability

of an individual with whom the qualified individual is known to have a relationship or association." 42 U.S.C. § 12112(b)(4).

A plaintiff can make out a *prima facie* case of associational disability discrimination by showing: "(1) she was qualified for the job at the time of the adverse employment action; (2) she was subjected to an adverse employment action; (3) she was known by her employer at the time to have a relative or associate with a disability; and (4) her case falls into one of the three relevant categories of expense, distraction or association." *Magnus v. St. Mark Methodist Church*, 688 F.3d 331, 336-37 (7th Cir. 2012). To show that her case falls into one of the three relevant categories, a plaintiff must show the employer had a motive to discriminate against the plaintiff by showing the employer was concerned that the associate's disability would cause the employer expense, would cause the employee to be distracted from work or would cause the employee himself to become disabled. *Larimer v. International Bus. Machines Corp.*, 370 F.3d 698, 700 (7th Cir. 2004).

Here, plaintiff does not attempt to make out a *prima facie* case of discrimination. Instead, Wong argues that she has circumstantial evidence of discrimination. Wong points to Principal Szuch's notes in which Szuch stated that Wong had told her she was getting divorced and Szuch had told Wong that Szuch's friend had had a depressed boyfriend. Even assuming that a reasonable jury could conclude from this evidence that Szuch knew Wong's husband had a disability, Wong has put forth no evidence from which a reasonable jury could conclude that Thompson suspended Wong or that the Board failed to renew her contract due to Wong's husband's alleged disability. Wong has not put forth evidence that Thompson or the Board was

aware of Wong's husband's alleged disability, let alone evidence that it was a factor in their decision.[5]

Defendant is entitled to judgment as a matter of law on Count VI. Defendant's motion for summary judgment on Count VI is granted.

### E. Wong's Due Process claim

In Count VII, Wong alleges that defendants violated her constitutional rights by infringing upon her liberty interest in her job without due process. Defendants move for summary judgment.

As the Seventh Circuit has explained, an "occupational liberty claim may arise when, after an adverse employment action, a public employer stigmatizes the employee by making public comments impugning his good name, honor, or reputation or imposes a stigma that forecloses other employment opportunities." *Palka v. Shelton*, 623 F.3d 447, 454 (7th Cir. 2010). To prevail, a plaintiff must show, "(1) the defendant made stigmatizing comments about [her]; (2) those comments were publicly disclosed; and (3) [she] suffered a tangible loss of other employment opportunities as a result of the public disclosure." *Palka*, 623 F.3d at 454.

Plaintiff's liberty claim suffers from a number of problems, not the least of which is that it is not clear which defendants she claims are liable. What is clear is that plaintiff is complaining about her suspension. (Plaintiff's Brief at 47) ("[defendants'] summary suspension of Plaintiff from her teaching duties, even though with pay, is the kind of stigmatizing conduct

_____

[5]In her brief, Wong argues, "Szuch admits that she informed the Board this [Wong's husband's alleged disability] was a reason to not rehire her." (Plf. Brief at 44). Wong, however, does not provide a citation for the fact. The "fact" is neither listed in plaintiff's statement of facts nor supported by admissible evidence. The Court will not consider the "fact."

which requires a hearing.").  It is undisputed that on March 11, 2011, Thompson decided to suspend Wong with pay, because she had released the Conditions of Teaching survey results without her principal's permission.  Wong was informed a week later.  This reason for Wong's suspension, however, is not stigmatizing, as a matter of law.  To be stigmatizing, the reason must imply dishonesty or moral turpitude.  *Hedrich v. Board of Regents of the Univ. of Wis.*, 274 F.3d 1174, 1184 (7th Cir. 2001).

Plaintiff's claim has a bigger problem in that plaintiff has put forth no evidence from which a reasonable jury could conclude that the information was published.  The "public-disclosure element requires that the defendant actually disseminate the stigmatizing comments in a way that would reach potential future employers or the community at large."  *Palka*, 623 F.3d at 454.  Wong argues merely that the information was in her personnel file.  That does not suffice, as a matter of law.  *Johnson v. Martin*, 943 F.2d 15, 17 (1991) ("we have no problem determining that potentially stigmatizing information which remains in a discharged employee's personnel file and has not been disseminated beyond the proper chain of command within the [employer's organization] has not been made public.").

Finally, plaintiff's claim fails, because she has put forth no evidence from which a reasonable jury could conclude that she suffered tangible loss of other employment opportunities.  Instead of putting forth evidence, plaintiff argues that it is "obvious" that employment opportunities would be foreclosed.  (Plaintiff's brief at 46).  She argues she "specifically pled that as a result of these statements, she has been unable to obtain other employment within education" and that she "need plead nothing more to state a claim upon which relief may be granted."  (Plaintiff's brief at 46).  The Court is not considering a motion to

dismiss. It is considering a motion for summary judgment, and in response to a motion for summary judgment, a party may not rest on its pleadings. Summary judgment is "the 'put up or shut up' moment in litigation, by which we mean that the non-moving party is required to marshal and present the court with the *evidence* she contends will prove her case." *Goodman v. National Sec. Agency, Inc.*, 621 F.3d 651, 654 (7th Cir. 2010) (internal citations omitted) (emphasis added). Plaintiff has failed to put forth any evidence that she suffered loss of employment opportunities.

Plaintiff has failed to put forth sufficient evidence from which a reasonable jury could rule in her favor on Count VII. Defendants are entitled to judgment as a matter of law on Count VII, and their motion for summary judgment on this count is granted.

###    F.    Wong's remaining state claims

The Court has disposed of all of the federal claims over which it has original jurisdiction. The Court's jurisdiction over plaintiff's remaining state claims–Counts III and IV–is supplemental. The presumption is that when the federal claims have dropped out of a case, the Court should relinquish jurisdiction over the remaining state claims. *RWJ Mgt. Co. Inc. v. BP Products North Am. Inc.*, 672 F.3d 476, 479 (7th Cir. 2012). The Court sees no reason why a different result should occur in this case and, accordingly, exercises its discretion to relinquish jurisdiction over Counts III and IV. Because the Court is relinquishing jurisdiction over those claims, the Court denies defendants' motion for summary judgment with respect to those claims.

**IV.**     **Conclusion**

For the reasons set forth above, the Court grants in part and denies in part defendants'

motion for summary judgment.  The Court grants defendants summary judgment on Counts I, II,

V, VI and VII.  The Court dismisses without prejudice Counts III and IV.  Case terminated.


ENTER:


_George M. Marovich_
George M. Marovich
United States District Judge


DATED:  March 10, 2015